[Crim. No. 2616.   Second Appellate District, Division One.—February 26, 1935.]

THE PEOPLE, Respondent, v. JAMES LYON, Appellant.

Clifford Thoms for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

THE COURT.—From a judgment of conviction of the crime of grand theft, as well as from an order by which his

motion for a new trial was denied, defendant has appealed to this court.

As far as concerns a determination of the point presented by appellant to the effect that the evidence was insufficient to support the judgment, the following constitutes a brief summary of the evidence adduced on the trial of the action:

Defendant was engaged in business in the city of Los Angeles as a stock broker. Habitually he made his purchases of stock, either on margin or for cash, through a firm of stock brokers whose business was located in the city of Denver, Colorado. Through defendant and his Denver correspondent, some of defendant's customers had made large purchases of stock on margins, and on account of such transactions, "on paper" had apparently suffered a considerable pecuniary loss. The several certificates of stock which represented the holdings of such customers of defendant were in the possession of his Denver correspondent, as were some certificates of stock of which defendant was the owner and which had been deposited by defendant with, or which at least were retained by, such Denver correspondent, as security for any indebtedness that might arise or exist against defendant and in favor of said Denver correspondent. In order to retain the good will of his customers who, through their investment with defendant and his Denver correspondent, had lost rather heavily on their marginal investments, defendant took over their rights in their respective holdings and assumed as his own the respective and aggregate losses of such customers. Aside from the obligations thus created, the business of defendant was in a solvent condition; but in connection with the assumed obligations of his customers, the evidence was conflicting as to whether defendant was then insolvent. In such state of affairs, defendant received an order from one Dunham to buy for him 200 shares of "Radio",—on account of which order, and two days after it had been given, Dunham paid to defendant the sum of $770. At the time when such order was given, Dunham told defendant that he was buying the stock for his mother or his mother-in-law, and that, as distinguished by Dunham, the investment was a "cash transaction"; to which statement defendant responded: "That is perfectly all right, Mr. Dunham, I will wire the order today to Denver and I will mail my check today to Denver, making it a cash transac-

tion." Thereupon defendant telegraphed his order to his Denver correspondent for the shares of stock which Dunham had ordered from defendant; but neither then, nor at any time thereafter, did defendant send his check to his Denver correspondent for the shares of stock thus ordered. On the day when defendant received the $770 from Dunham, which, as hereinbefore stated, was two days after defendant had bought the stock through his Denver correspondent, defendant made the statement to Dunham that he (defendant) had "wired the order and had mailed the check . . . " On receipt of such "wire", it appears that the Denver correspondent made the purchase of the stock,—its confirmatory message to defendant being as follows:

"We confirm purchase for your account and risk of the following securities: Number of shares, 200 Radio Corp. Price 3-¾; Extension $770. Commission, $20. Total, $770 . . . "

Thereupon defendant told Dunham that the stock had been bought and inquired of him whether he wished the stock certificate delivered to him, or to his mother or his mother-in-law, for whom the stock had been purchased; to which inquiry Dunham replied in substance that the stock had been bought as a "speculation", and that it should be left where it was in its "street name", in order that if sold the contemplated transaction might be the easier consummated. Within four months thereafter, defendant made to Dunham a general assignment of all his assets for the benefit of defendant's creditors. At that time defendant again suggested to Dunham that he take over to himself, or to his mother or his mother-in-law, the "200 shares of Radio" which defendant had purchased for Dunham, as hereinbefore set forth. Dunham again declined to do so. In that connection, he said: "Well, I am not going to touch that on Mrs. Dunham's account until after the other accounts of the firm are cleaned out."

During a period of several months next ensuing, Dunham administered upon the assets and the liabilities of defendant, at the close of which administration he received from the assignee of defendant's correspondent certain certificates of shares of several different corporate stocks, which included 200 shares of "Radio", for all of which he then paid the sum of $801.07. It also appears that theretofore, on be-

half of one of defendant's customers for whom defendant had acted as a broker, the certificate for other 200 shares of "Radio" stock had been withdrawn by Dunham from the Denver correspondent without paying anything therefor. Additional evidence showed that, in view of the business in which defendant was engaged, and particularly in view of the manner in which defendant conducted his business with his Denver correspondent, defendant acted in the manner ordinarily obtaining in the purchase on a "cash transaction" basis of shares of stock that were ordered by a customer of a stockholder.

By sections 20 and 21 of the Penal Code it is provided that: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence. The intent or intention is manifested by the circumstances connected with the offense, . . . "

█ From a consideration of the evidence adduced on the trial of the instant action, one's mind must be impressed with the conclusion that the offense of which defendant was accused was not committed by him either with an express or an implied intent on his part either to unlawfully convert to his own use the $770 which had been placed in his possession for the purpose of purchasing, or of paying for, the shares of "Radio" stock, or to feloniously obtain for himself the certificate of ownership thereof. It is a fair inference that defendant either believed, or at least that he had a right to believe, that his credit with his Denver correspondent was such that it was wholly unnecessary that in making a purchase of the 200 shares of "Radio", at that particular time he should forward to such correspondent the cash value of such stock. Besides, as hereinbefore has been stated, at the time when he bought the stock Dunham had not paid defendant therefor. Although the purchase had been ordered by Dunham, it was not until two days thereafter that he actually gave his check to defendant in payment thereof. Notwithstanding the unsatisfactory state of the evidence regarding the solvency of defendant at that time, and perhaps as a matter of good business judgment, questioning the advisability of an extension or enlargement by the Denver correspondent of the credit to which defendant was properly entitled, nevertheless the outstanding fact appears that defendant's credit was such that his

Denver correspondent actually purchased the 200 shares of "Radio" for defendant's "account and risk" and that for a long time thereafter such shares of "Radio" were held subject to Dunham's order; but that solely because of the fact that the stock was purchased for speculation, with an intention of its future sale, it was consciously, by the direction or the request of Dunham, permitted to remain in its "street name" in the physical possession of the Denver correspondent. By no outward act, nor by any apparent conduct on the part of defendant, may it be fairly concluded that he had any intention of departing from a fixed business method or standard in transacting the business with which he had been entrusted. If in the subsequent course of events Dunham lost his stock, or, in order to obtain its possession, in fact was obliged to pay a sum of money in addition to its original cost (which latter fact does not satisfactorily appear), it was by reason of his own fault or negligence. It is concluded that the evidence adduced on the trial of the action was insufficient to sustain the verdict that was returned by the jury.

The judgment and the order by which the motion for a new trial was denied are reversed.